883 So.2d 766 (2004)
Dennis SOCHOR, Appellant,
v.
STATE of Florida, Appellee.
Dennis Sochor, Petitioner,
v.
James V. Crosby, Jr., etc., Respondent.
Nos. SC01-885, SC02-1797.
Supreme Court of Florida.
July 8, 2004.
Rehearing Denied September 21, 2004.
*769 Rachel L. Day, Assistant CCRC, Kenneth M. Malnik, Assistant CCRC and Paul E. Kalil, Assistant CCRC, Capital Collateral Regional Counsel  Southern Region, Fort Lauderdale, FL, for Appellant.
Charles J. Crist, Jr., Attorney General and Celia A. Terenzio, Assistant Attorney General, West Palm Beach, FL, for Appellee.
PER CURIAM.
Dennis Sochor, an inmate under sentence of death, appeals an order of the circuit court denying his motion for postconviction relief under Florida Rule of Criminal Procedure 3.850. He also petitions this Court for a writ of habeas corpus.[1] For the reasons expressed below, we affirm the order of the circuit court and deny the habeas petition.

I. BACKGROUND
Sochor was convicted of kidnapping and first-degree murder.[2] In accordance with the jury's ten-to-two recommendation, the judge sentenced Sochor to death, finding four aggravating circumstances[3] and no mitigating circumstances. Sochor v. State, 580 So.2d 595, 599 (Fla.1991). On direct appeal, we found that the evidence was not sufficient to meet the heightened level of premeditation necessary for the "cold, calculated, and premeditated" aggravating circumstance. Id. at 603. Nevertheless, we affirmed the convictions and the death sentence, holding that in light of the other aggravating circumstances which the trial court found and the absence of mitigating circumstances, the death sentence was proportionate and no resentencing was required. Id. at 604.
The United States Supreme Court granted certiorari, vacated the sentence, and remanded the case, holding that we failed to perform a harmless error analysis. Sochor v. Florida, 504 U.S. 527, 540, 112 S.Ct. 2114, 119 L.Ed.2d 326 (1992). On remand, we held that the trial judge's weighing of the invalid aggravating factor was "harmless error," and we therefore affirmed Sochor's death sentence. Sochor v. State, 619 So.2d 285, 293 (Fla.1993).
Sochor then filed a rule 3.850 motion for postconviction relief in which he raised thirty claims.[4] Following a Huff hearing,[5] *770 the circuit court granted a limited evidentiary hearing.[6] After the evidentiary hearing, the circuit court denied the motion for postconviction relief. Sochor now appeals the circuit court's denial.[7] He also petitions for a writ of habeas corpus.[8] As *771 stated above, we affirm the circuit court's denial of relief and deny the habeas petition.

II. RULE 3.850

A. Penalty Phase Ineffectiveness of Counsel

Sochor argues that he was deprived of his Sixth Amendment right to effective assistance of counsel because his lawyer failed to investigate, prepare, and present evidence that would support the existence of two statutory mitigating circumstances and several nonstatutory mitigating circumstances. He claims that counsel did not thoroughly investigate his background and did not provide any information about his background to the mental health experts who evaluated him, rendering their evaluations inadequate for the purpose of developing evidence of mitigating circumstances. He also claims that counsel did not adequately prepare his penalty phase lay witnesses before they testified. Sochor argues that this deficiency in his counsel's performance prevented the jury and the judge from understanding the true nature and extent of his troubled background and mental health status. As a result, he argues, the outcome of the penalty phase was unreliable. He argues that there is a reasonable probability that he would not have been sentenced to death had counsel not been deficient.
To be entitled to relief on this claim, Sochor must show that his attorney's performance was deficient and that the deficient performance prejudiced his defense. Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); see also Wiggins v. Smith, 539 U.S. 510, 123 S.Ct. 2527, 2535, 156 L.Ed.2d 471 (2003); Williams v. Taylor, 529 U.S. 362, 390, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). To satisfy the deficiency prong, Sochor must show "that counsel made errors so serious that counsel was not functioning as the `counsel' guaranteed the defendant by the Sixth Amendment." Strickland, 466 U.S. at 687, 104 S.Ct. 2052. Sochor must demonstrate that counsel's representation "fell below an objective standard of reasonableness." Id. at 688, 104 S.Ct. 2052. If Sochor can establish that counsel's performance was deficient, he must then "show[] that counsel's errors were so serious as to deprive [him] of a fair trial, a trial whose result is reliable." Id. at 687, 104 S.Ct. 2052. In other words, in order to establish the prejudice prong, Sochor "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694, 104 S.Ct. 2052. As the Court explained in Strickland, "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. In the penalty phase context, "the question is whether there is a reasonable probability that, absent the errors, the sentencer... would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." Id. at 695, 104 S.Ct. 2052.
When we review a circuit court's resolution of a Strickland claim, as we do here, we apply a mixed standard of review because both the performance and the prejudice prongs of the Strickland test present mixed questions of law and fact. *772 See id. at 698, 104 S.Ct. 2052 ("Ineffectiveness is ... a mixed question of law and fact."); Stephens v. State, 748 So.2d 1028, 1033 (Fla.1999). We defer to the circuit court's factual findings, but we review de novo the circuit court's legal conclusions. Stephens, 748 So.2d at 1033 ("Thus, under Strickland, both the performance and prejudice prongs are mixed questions of law and fact, with deference to be given only to the lower court's factual findings."); see also Hodges v. State, 28 Fla. L. Weekly S475, S476, 2003 WL 21402484 (Fla. June 19, 2003) ("Ineffective assistance of counsel claims are mixed questions of law and fact, and are thus subject to plenary review based on the Strickland test. Under this standard, the Court conducts an independent review of the trial court's legal conclusions, while giving deference to the trial court's factual findings.") (citation omitted). With these principles in mind, we now analyze Sochor's ineffective assistance of counsel claim.

1. The Deficiency Prong

We agree with Sochor that his counsel's penalty-phase performance was deficient. Our review of the penalty-phase transcript and the evidentiary-hearing testimony reveals that Sochor's counsel put little time or effort into preparing expressly for the penalty phase.[9]
The only witnesses counsel presented at the penalty phase were four members of Sochor's family. One of these witnesses, a sister, was not even contacted by counsel. She learned about the penalty phase from another relative and traveled to Florida on her own. When she arrived, she told counsel that she wanted to testify; counsel quickly glanced at a statement she had prepared and told her she could read it to the jury. The other three witnesses received no more preparation from counsel. Counsel simply asked them to prepare statements to read to the jury. In addition to these lay witnesses, counsel introduced the reports of three mental health experts who testified during the guilt phase. However, counsel did not provide these experts with any information about Sochor's background, nor did he specifically instruct them to examine and evaluate Sochor for the purpose of establishing mitigating evidence.
Based on these undisputed facts, counsel's performance was clearly deficient, and the circuit court's holding to the contrary was erroneous. See State v. Lewis, 838 So.2d 1102, 1113 (Fla.2002) ("[T]he obligation to investigate and prepare for the penalty portion of a capital case cannot be overstated  this is an integral part of a capital case."); Rose v. State, 675 So.2d 567, 571 (Fla.1996) ("An attorney has a duty to conduct a reasonable investigation, including an investigation of the defendant's background, for possible mitigating evidence.") (quoting Porter v. Singletary, 14 F.3d 554, 557 (11th Cir. 1994)).

2. The Prejudice Prong

We now must determine whether Sochor established that he was prejudiced by counsel's deficient performance. See Wiggins, 123 S.Ct. at 2542 ("In order for counsel's inadequate performance to constitute *773 a Sixth Amendment violation, petitioner must show that counsel's failures prejudiced his defense.").[10] As we noted above, in order for Sochor to establish that counsel's deficient performance prejudiced his defense, he "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the [penalty-phase] proceeding would have been different." Strickland, 466 U.S. at 694, 104 S.Ct. 2052; see also Wiggins, 123 S.Ct. at 2542.[11]
*774 The circuit court held that Sochor had not established prejudice. As we explain below, inherent in the circuit court's conclusion, made after hearing the conflicting testimony presented at the evidentiary hearing, is the factual finding (which we conclude is supported by competent, substantial evidence) that even if defense counsel had adequately investigated Sochor's background and prepared for the penalty phase, he would not have been able to present at the penalty phase any evidence significantly different from the evidence actually presented.[12] Deferring to this factual finding, we agree with the circuit court's conclusion that Sochor failed to show a reasonable probability that absent counsel's errors, he would not have been sentenced to death. To explain why, we will recount the pertinent penalty-phase lay testimony and the guilt-phase expert testimony that the jury heard as well as the testimony Sochor presented at the postconviction evidentiary hearing.

a. Penalty-Phase Evidence

As we mentioned earlier, four of Sochor's family members testified at the penalty phase: his parents, Charles and Rose Sochor; his brother, Gary Sochor; and his sister, Kathy Cooper. Their testimony revealed the following facts about Sochor: he was one of ten children; his father singled him out for repeated and brutal beatings; his mother also beat him; when he was four years old, he fell while running with a tin horn in his mouth and the tin horn went through the roof of his mouth; for a period of time when his father had been demoted at work, Sochor gave the family his paychecks; his parents noticed that he changed after he was discharged from the army  specifically, he became violent, especially when under the influence of alcohol; at one point, his parents thought he needed psychiatric help and were able to get him involuntarily committed to a hospital, but he was quickly released when the hospital told the family that although he needed psychiatric help, he was "not severe enough" to be kept there; and he attempted to commit suicide.
Sochor's father, Charles, recounted a time when he had come home from work to learn that Sochor's mother, Rose, had "lost her temper and beat Denn[is], then banged his head against the wall." Charles testified that he too would to lose his temper and beat the children, with "Denny always getting the worst of it." He told the jury of the head injury suffered by Sochor when he was four years old: Sochor had fallen while running with a tin horn in his mouth, and the horn went through the roof of his mouth, "opening a hole that you could see right into his head." Charles also told the jury that he began to notice changes in Sochor after he *775 was released from the army, saying that he "was violent, especially when alcohol was involved. He was completely out of control." Charles testified that he and Rose realized at this point that Sochor "needed mental help," and he told the jury about their attempt "to get him institutionalized." After they convinced a judge to commit him to a mental hospital, Sochor was released after "less than a week," on the condition that he would report once a week. Sochor was upset that his parents had him committed to the hospital, so he left home. Sochor's father testified that he had not seen or spoken to Sochor since that incident, with the exception of one phone call he received from Sochor in which Sochor told him that he had attempted to commit suicide.
Sochor's mother told the jury that Sochor had a "difficult childhood" and that she was "an abusive mother." She testified that Sochor had "a lot of hostility and problems" as he got older and things became worse after he was discharged from the army, especially when he drank alcohol. She discussed the time she and Sochor's father tried to get Sochor mental help, telling the jury that the counselors "told [them] that he definitely needed psychiatric help, but was not severe enough" to be kept there.
Sochor's brother, Gary, testified that Sochor was beaten a lot as a child, that he took the brunt of their father's beatings, and that their father used to beat them with a "big belt."
Sochor's sister, Kathy Cooper, gave the most in-depth and descriptive penalty-phase testimony about the beatings suffered by Sochor as a child. She told the jury that Sochor "had a pretty rough life" and that most of their parents' frustrations were taken out on Sochor. She described their father as a former boxer who was "very strong," "knew how to hit," and had "a very quick and violent temper." She told the jury that there were times when the other children would have to pull their father off Sochor. She testified that their father would go into "a rage" and would trap Sochor in a corner and hit him over and over  in the face, arms, and the rest of his body  resulting in Sochor "constantly [having] his lips split open, black eyes, [and] bruises all over his body." She described an incident where their father grabbed Sochor's hair and "kept banging his head against the wall." She told the jury that their mother watched this happen and did nothing to stop it. Like her parents, Kathy testified that the family tried to get mental help for Sochor but the psychiatric hospital told them that "he wasn't bad enough to where he needed help."
Sochor's trial counsel also introduced the reports of three mental health experts who had evaluated Sochor and testified during the guilt phase: Dr. Zager, a psychiatrist; Dr. Ceros-Livingston, a clinical psychologist; and Dr. Castillo, a psychiatrist.[13] As mentioned previously, counsel did not provide any background materials to these experts; their evaluations were based solely on information gathered from their clinical interviews with Sochor. Nor did counsel instruct the experts to conduct their evaluations with an eye towards developing evidence of mitigating circumstances; rather, their evaluations were done for the purpose of determining Sochor's competency to stand trial and his sanity at the time of the crime. They all testified that Sochor was competent to *776 stand trial and was sane at the time of the crime. However, their testimony went beyond merely answering these questions, and counsel referred to their testimony and their reports in his penalty-phase closing argument.
Dr. Zager interviewed Sochor, during which he observed Sochor and gathered his "history," which Dr. Zager defined as emotional and psychiatric problems, present legal circumstances, medical history, history of drug or alcohol use, educational history, family history, childhood experiences, and relationship history. Dr. Zager also conducted a mental status examination, which consisted of his observations not only of what Sochor said to him, but also how he said it, his stream of thought, and his orientation and awareness of present circumstances. In his guilt-phase testimony, Dr. Zager told the jury the following facts about Sochor: he had a history of drug and alcohol problems and a history of alcoholic blackouts; he claimed to have had an alcoholic blackout the night of the murder; he reported having suffered two concussions and having fallen off a horse and hitting his head as a child; and he believed his mother physically abused him as a child. Dr. Zager also told the jury that after Sochor was arrested, he was prescribed Lithium, a psychotropic medication that Dr. Zager described as a moodstabilizing drug, and Sinequan, which he described as an antidepressant.
Dr. Zager told the jury that Sochor appeared to manifest evidence of a "longstanding problem of drug and alcohol abuse" and of a "conduct disorder, socialized, aggressive type" as a child. He suspected that Sochor suffered from "antisocial personality disorder," and he believed Sochor was "a much more aggressive, potentially very violent, individual under the influence of intoxicants." He believed that Sochor acted impulsively and with impaired judgment while under the influence of alcohol. Although he did not believe Sochor met the requirements for involuntary hospitalization under the Baker Act, see §§ 394.451-.4789, Fla. Stat. (2003), he did believe that Sochor was "extremely dangerous to the public."
Dr. Ceros-Livingston also evaluated Sochor and testified during the guilt phase. She told the jury that Sochor reported a long-term history of drug and alcohol abuse, starting at a very young age; that Sochor reported that the United States Army, upon discharging him, recommended that he get psychiatric care; and that Sochor reported that he had attempted to commit suicide by drowning. Dr. Ceros-Livingston also administered two psychological tests: the Carlson Psychological Survey (CPS) and the Minnesota Multiphasic Personality Inventory (MMPI). She testified that results of the CPS revealed a profile similar to those obtained from people who have alcohol and drug abuse as a major characteristic; it also matched the profile of a person with a quick temper which might result in impulsive and destructive behavior. She testified that the profile obtained from the MMPI was invalid ("fake-bad"), which means that the person is trying to "make [himself] look psychopathological." Based on the "fake-bad" MMPI profile, and noting that Sochor had recounted "some things that had happened in his feelings and what he allegedly said around the alleged crime," Dr. Ceros-Livingston testified that Sochor possibly was "malingering."
Finally, Dr. Castillo testified for the State at the guilt phase. Like Dr. Zager, Dr. Castillo told the jury that Sochor was being medicated with Lithium, which he described to the jury as a medicine used mostly to treat manic depressive illness. He described manic depressive illness as a *777 mood- and behavior-affecting condition. However, Dr. Castillo also told the jury that he did not believe that Sochor suffered from manic depressive illness. Nor did he believe that Sochor had blacked out on the night of the murder. He believed that Sochor was suffering from "a type of selective amnesia." Like Dr. Zager, Dr. Castillo concluded that Sochor suffered from antisocial personality disorder.

b. Postconviction Evidence

At the postconviction evidentiary hearing, Sochor presented the testimony of the same four family members who had testified at the penalty phase. He also presented the testimony of additional family members and some lay acquaintances whom trial counsel never contacted. Sochor's father testified that he began to beat Sochor with a belt "a couple times a week" when Sochor was between six and eight years old. When Sochor was older, he would hit him with his fists. He also testified that when Sochor was about five or six years old, his older brother was severely burned. Sochor's mother testified that she had a "difficult labor" when Sochor was born and that Sochor had marks on his head from the forceps and his head was "very pointed and blue." She also told the jury that Sochor's older brother had been severely burned when Sochor was a child. She again testified that she would sometimes hit Sochor and that Charles would beat the children too. Sochor's sister, Kathy Cooper, again testified about the time Sochor's father grabbed Sochor's hair and beat his head against the wall. She also testified about a time when Sochor's father kicked Sochor and then repeatedly punched him in the face. She testified that she was sexually molested by their father when she was a teenager. Sochor's brother, Gary, testified that their father would beat the children with his "belt, fist, open hands, whatever," and he would beat Sochor until he was bleeding, knocked out, or knocked down and in so much pain that he did not get up. He also testified that Sochor used a lot of drugs.
In addition to these four family members, Sochor presented testimony at the evidentiary hearing from other family members, friends, and teachers. One of Sochor's high school friends, Earl Mitchell, testified about a time when Sochor got into a fight with a man much larger than he. The man picked Sochor up, threw him to the ground, and slammed his head into the pavement. He also estimated that he and Sochor "drop[ped] acid" over 150 times in 1971. One of Sochor's childhood friends, Marvin Droste, testified that Sochor's childhood home was "disheveled" and "unkempt," and Sochor's family was poor. He testified that Sochor's father had a reputation for being "tough on the kids," and Sochor would often tell him that his father had "whipped on" him. He testified about Sochor's drug use and said that Sochor was "prone to quick changes and moods, quick mood swings and bouts of depression."
Christine Thatcher testified that she worked with Sochor one summer at a professional acting company where Sochor was an intern. She testified that Sochor performed a dance number that was "stunning," but that he was "untrained" and "unskilled." He was "unfocused" and "undisciplined" at the beginning of the summer, but was "working extremely diligently" by the end. Louis Lascala, Sochor's high school teacher and junior varsity basketball coach, testified that Sochor lacked "team skills" and was quiet and withdrawn from the other kids on the team. Father Melvin Cox, a Catholic priest and high school teacher, testified that Sochor was "very unmotivated" and showed "signs of depression." Helen Foley, a family friend, *778 testified that Sochor's father was quiet and severe and his mother was more laid back. She also testified that Sochor was artistic.
Sochor's younger brother, Blaine, and his younger sisters, Lisa Elaine Fisher and Melanie Wheeler, testified that their father used to beat Sochor. Blaine also testified that there were times when they were so hungry they would hunt for food, and Sochor was a "very good" brother who taught him to play sports and fish. Lisa Elaine and Melanie testified that Sochor was very protective of them. Melanie also testified that their older brother, Gary, molested and sexually abused her when she was eleven or twelve years old, and her parents did not believe her when she reported it to them. She also testified that she caught her father peeking in on her when she was in the shower and feared that he would abuse her too.
Sochor also presented the testimony of two new mental health experts: Dr. Greer, a neuropsychiatrist; and Dr. Froming, a clinical psychologist and neuropsychologist. In addition, the State presented the testimony of Dr. Ceros-Livingston, the clinical psychologist who had evaluated Sochor and testified for the defense during the guilt phase. Sochor's postconviction counsel provided these new mental health experts, as well as Dr. Ceros-Livingston, with the background materials  jail and prison records, school records, military records  that Sochor claims trial counsel should have provided to the original experts. The new experts evaluated Sochor to determine if any mitigating circumstances could have been presented at the penalty phase.
Dr. Greer testified that Sochor suffers from manic depressive illness and alcohol and polysubstance abuse disorder. He testified that he diagnosed Sochor with manic depressive illness based on his review of Sochor's prison records, which indicated that Sochor had been repeatedly diagnosed as having such illness and was being treated with Lithium. He testified that his clinical interview with Sochor confirmed this diagnosis. In the interview, Sochor exhibited tangentiality, "flight of ideas," rapid or pressured speech, grandiosity, and a hypomanic or somewhat manic mood. Dr. Greer believed that Sochor suffers from "mixed type" manic depression, which means that he has florid or full-blown manic episodes as well as depressive episodes.
Based on his evaluation of Sochor, Dr. Greer testified that there was evidence to support two mental health-related statutory mitigating circumstances. He believed the combination of manic depressive disorder and Sochor's consumption of alcohol on the night of the murder resulted in Sochor's lacking the ability to conform his conduct to the requirements of the law. He testified that although a person in the manic phase of the illness may know that what he is doing is wrong, his hyperactive state prevents him from being able to stop himself. Dr. Greer also believed that Sochor had been under extreme mental or emotional disturbance at the time of the murder. He believed that manic depression, being a chronic illness, was likely to have been present at the time of the murder and it was likely that when combined with alcohol, the manic phase of the illness would have been a problem for him.[14] He believed Sochor was in the manic phase of the illness at the time of the murder based on the testimony of those who witnessed him at the time and based on Sochor's own *779 statements that he had the illness, had consumed alcohol, and was in a hypermotoric state.[15]
Dr. Froming, the clinical psychologist and neuropsychologist, testified that Sochor had "moderately severe" brain impairment, a substance dependence disorder, bipolar affective disorder (mild with a mixed episode), and posttraumatic stress disorder as a result of the severe childhood physical and sexual abuse that was in the home.[16] She believed that the background records provided by Sochor's postconviction counsel indicated the presence of several potential risk factors for brain damage: Sochor's mother smoked during pregnancy; she had an extended labor with forceps delivery; Sochor had suffered head injuries, inflicted by his parents and incurred in various accidents; he had a history of alcohol abuse; and he grew up in an environment characterized by severe family violence and abuse. Dr. Froming testified that in her clinical interview with Sochor, she noted his rapid, pressured speech; flight of ideas; tangentiality; and depressed mood. She also testified that she conducted a battery of neuropsychological tests.
Like Dr. Greer, Dr. Froming believed that Sochor had been under extreme mental or emotional disturbance at the time of the murder and had been unable to conform his conduct to the law. She testified that the synergistic effect of combining brain damage with manic depressive illness resulted in "almost no ability to self-regulate" and "no ability to inhibit impulse." She believed that because Sochor had abstained from alcohol in the period leading up to the night of the murder, "as little as one to three drinks" would have made him "acutely intoxicated."[17] Dr. Froming criticized the evaluations and testimony of the original experts. She criticized their lack of attention to the fact that Sochor had been prescribed Lithium. She was also critical of Dr. Ceros-Livingston's MMPI analysis. Dr. Froming testified that the raw data could have supported Dr. Ceros-Livingston's "fake-bad" conclusion, but she believed it also could have supported a "cry for help" profile or an exaggeration of symptoms due to distress. She believed that Dr. Ceros-Livingston's evaluation was "far too brief" and there were "other things that she could have done to expand and corroborate or refute her fake bad interpretation."
Finally, Dr. Ceros-Livingston, the psychologist who had evaluated Sochor and testified for the defense at the guilt phase of the trial, testified for the State at the evidentiary hearing. At this point, she had reviewed the background materials that Sochor's postconviction counsel had provided to the new experts. She stated that her original diagnosis and testimony were unaffected by her review of these new materials. She testified that nothing in the background materials indicated that Sochor suffered from manic depression or organic brain damage. She believed that a diagnosis of manic depressive illness was inconsistent with the fact that Sochor was able to sit still and concentrate during the *780 eight-hour examination conducted by Dr. Froming. She also disputed the significance of the notations in the prison records that Sochor had been prescribed Lithium  a factor relied on by the new experts to support their diagnoses of manic depression. Dr. Ceros-Livingston noted that none of the records actually recorded any symptoms of manic depression, e.g., pressured speech, flight of ideas, distractibility, grandiosity, etc. She also noted that none of the many mental status exams included in the prison records ever reported that Sochor was having mood problems. Even more importantly, she stressed that even though Sochor had been prescribed Lithium in prison, he was at various times taken off the drug and the prison records never indicated that he exhibited any symptoms of manic depression during these Lithium-free periods. She also noted that the military conducts extensive physical exams, and none of Sochor's military records indicated a diagnosis (or even the presence of any symptoms) of manic depression. Finally, she testified that there was nothing in the record that suggested to her that Sochor was in a manic phase at the time of the murder.

c. The Circuit Court's Findings

After the evidentiary hearing, the circuit court denied relief. The court found that the lay testimony presented at the evidentiary hearing was either cumulative with respect to the penalty phase testimony or insignificant. As for Sochor's relatives who testified at both the penalty phase and the evidentiary hearing, the court found that they "testified about the same facts" at the evidentiary hearing as they did at the penalty phase. State v. Sochor, Case No. 86-15270CF10A (Fla. 17th Cir. Ct. order filed Mar. 28, 2001) ("Postconviction order") at 13. The court also found that the additional family-member testimony presented at the evidentiary hearing was "cumulative" and "was presented at the penalty phase by other family members," and the additional lay testimony presented at the evidentiary hearing was "cumulative and not significant." Id. at 13-14.
With respect to the mental-health testimony, the circuit court gave great weight to Dr. Ceros-Livingston's testimony at the evidentiary hearing. For instance, the court stated:
At the evidentiary hearing, Dr. Ceros-Livingston testified that, even after reviewing the new information provided by the Defendant's appellate counsel, her original opinions regarding the Defendant remained the same. In her opinion, the records presented to her did not indicate manic depression or organic brain damage. There was no indication that the Defendant's behavior changed whether he was on Lithium or not.
Postconviction order at 8 (citations omitted). The court found that:
Despite the fact that "mitigation" was not specifically discussed with Dr. Ceros-Livingston, the record indicates that the tests that she performed on Defendant allowed her to draw opinions in regards to his mental health, which were properly presented by defense counsel to the judge and jury during the penalty phase as mitigating factors. Furthermore, Dr. Ceros-Livingston testified at the evidentiary hearing that considering her previous evaluation in conjunction with the records and background material provided to her by the Defendant's appellate counsel in 1999, her diagnosis of the Defendant and testimony at the time of trial would have been the same. Dr. Ceros-Livingston testified at the evidentiary hearing that when the Defendant was evaluated in 1987, he did not have manic depressive disorder. Moreover, based upon the additional information provided to her in 1999, Dr. *781 Ceros-Livingston did not think that the Defendant had bipolar disorder or organic brain damage at the time of the murder.

Postconviction order at 9-10 (emphasis added); see also id. at 12 ("Dr. Ceros-Livingston clearly stated that her opinion would remain the same after considering the additional records.").

d. Our Independent Review

As we stated above, our job is to review independently the circuit court's legal conclusion  that is, whether Sochor has carried his burden of demonstrating a reasonable probability that the result of the penalty phase would have been different had counsel not been deficient. But in doing so, we must defer to the circuit court's factual findings if those findings are supported by competent, substantial evidence. As we stated in Porter v. State, 788 So.2d 917 (Fla.2001):
The reason we have required postconviction evidentiary hearings on capital postconviction motions claiming ineffective assistance of counsel is to provide a defendant an opportunity to present factual and expert evidence which was not presented at the trial of the case and to have the trial court evaluate and weigh that additional evidence. Following such an evidentiary hearing, we have held that the performance and prejudice prongs are mixed questions of law and fact subject to a de novo review standard but that the trial court's factual findings are to be given deference. So long as [the trial court's] decisions are supported by competent, substantial evidence, this Court will not substitute its judgment for that of the trial court on questions of fact and, likewise, on the credibility of the witnesses and the weight to be given to the evidence by the trial court. We recognize and honor the trial court's superior vantage point in assessing the credibility of witnesses and in making findings of fact.

Id. at 923 (citations omitted, emphasis added).
As our review of both the penalty phase and the evidentiary hearing testimony reveals, the circuit court's finding that Sochor presented no significant, noncumulative lay testimony at the evidentiary hearing is supported by competent, substantial evidence. The main lay-witness testimony at the evidentiary hearing concerned Sochor's abusive childhood and drug abuse. Testimony about Sochor's abusive childhood was presented at the penalty phase, and the guilt-phase experts told the jury about his history of drug abuse.
The closer question in this case is whether significant additional mental-health-related mitigation evidence was available that could have been presented at trial if counsel had not been deficient in his investigation and preparation. The answer to this question depends on whose evidentiary hearing testimony should be believed. Drs. Greer and Froming said such evidence was available. Dr. Ceros-Livingston said it was not. The postconviction trial judge heard all the evidence and was in a much better position than we are to "assess[] the credibility of [the] witnesses and ... mak[e] findings of fact." Id. at 923. After reviewing the record and affording due deference to the trial court's superior vantage point from which to make credibility assessments, we believe that the trial court's decision to give Dr. Ceros-Livingston's testimony greater weight than the testimony of Sochor's new experts was supported by competent, substantial evidence.[18]
*782 Dr. Ceros-Livingston evaluated Sochor much closer to the time of the murder than Sochor's new experts did. At the time of her trial testimony, Dr. Ceros-Livingston was aware of Sochor's history of alcohol and drug abuse. She was also told by Sochor that the army had recommended that he get psychiatric care and that he once attempted to commit suicide. After administering the MMPI, she concluded that Sochor possibly was "malingering." This was confirmed by Dr. Castillo, who believed that Sochor was suffering from "a type of selective amnesia." While Dr. Froming criticized Dr. Ceros-Livingston's MMPI analysis, she did admit that the raw data could have supported the "fake-bad" profile.
Furthermore, the evidentiary hearing experts' diagnoses of manic depressive disorder were contradicted by Dr. Ceros-Livingston's evidentiary hearing testimony and by the trial testimony of Drs. Zager and Castillo. Dr. Ceros-Livingston testified that even after reviewing the background records that were made available to the new experts, her original diagnosis did not change; she did not see anything in the records that suggested to her that Sochor suffered from manic depression. She noted that the new experts' reliance on the prison records was misplaced because those records did not actually indicate that Sochor had been suffering from any of the symptoms of manic depression; they indicated only that he had been prescribed Lithium. Furthermore, while both Drs. Greer and Froming testified that Sochor exhibited tangentiality, flight of ideas, rapid speech, grandiosity, and a manic mood  all symptoms of manic depression  such behavior was not observed by the trial experts who examined Sochor much closer to the date of the crime. Dr. Zager testified that in his interview with Sochor, he observed not only what Sochor was saying, but also how he said it and his stream of thought. At the time Dr. Zager made these observations, he was aware that Sochor had been prescribed Lithium and Sinequan, but he did not diagnose Sochor with manic depression. Rather, he believed that Sochor suffered from a "longstanding problem of drug and alcohol abuse" and a "conduct disorder, socialized, aggressive type." Similarly, Dr. Castillo was aware that Sochor had been prescribed Lithium, but he affirmatively ruled out a diagnosis of manic depression.
We are faced with a situation like the one we were faced with in Porter.[19] As we noted there:

*783 At the conclusion of the postconviction evidentiary hearing in this case, the trial court had before it two conflicting expert opinions over the existence of mitigation. Based upon our case law, it was then for the trial court to resolve the conflict by the weight the trial court afforded one expert's opinion as compared to the other. The trial court did this and resolved the conflict by determining that the greatest weight was to be afforded the State's expert. We accept this finding by the trial court because it was based upon competent, substantial evidence.
788 So.2d at 923. Another similar case was Cherry v. State, 781 So.2d 1040 (Fla.2000), where we deferred to the circuit court's factual findings and affirmed its denial of relief, even though Cherry's evidentiary hearing expert testified that Cherry suffered from fetal alcohol syndrome, organic brain damage, and mental retardation. Id. at 1044. We wrote the following:
Unlike Rose [v. State, 675 So.2d 567 (Fla.1996)], however, the testimony concerning the statutory mitigating evidence and some of the nonstatutory mitigating evidence was controverted either by the State during cross-examination or by Dr. Barnard [whose report was introduced into evidence at the penalty phase of Cherry's trial and who subsequently testified for the State at the evidentiary hearing]. The trial court rejected Dr. Crown's conclusions as to organic brain damage, fetal alcohol syndrome, and mental retardation to the extent they were based on mere speculation from the fact that Cherry's mother drank while pregnant and Cherry had been exposed to toxins as a child. Dr. Crown admitted that he had not performed any physical tests on Cherry to confirm these conclusions. The trial court also found that Dr. Crown's findings as to Cherry's borderline retardation and antisocial personality were contradicted by Dr. Barnard's reassessment of Cherry. Most significantly, Dr. Barnard, after considering the same background materials supplied to Dr. Crown, did not find any indication of organic brain damage and maintained the information did not support any statutory mitigating factors. The applicability of mitigating circumstances and the credibility of expert testimony are matters within the sound discretion of the trial court.
Cherry, 781 So.2d at 1051 (emphasis added).[20]
As in Porter and Cherry, we find that the circuit court's decision to credit the testimony of the State's mental health expert *784 over the testimony of Sochor's new experts is supported by competent, substantial evidence. We also conclude that the circuit court's finding that the evidentiary hearing lay testimony was either cumulative or insignificant is also based on competent, substantial evidence. Based on our deference to the circuit court's factual findings and our independent review of the circuit court's legal conclusion with respect to those factual findings, we hold that Sochor has not established that he was prejudiced by counsel's deficient performance.[21] Sochor has not demonstrated that but for counsel's deficient performance the result of the penalty phase would have been different. Accordingly, we affirm the circuit court's denial of relief on this claim.[22]

*785 B. Brady and Giglio Claims

Sochor claims that the State violated Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963),[23] by failing to disclose that it gave Gary Sochor immunity from prosecution in exchange for his testimony. Sochor also claims that the State violated Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972),[24] by failing to correct the record when Gary testified that he had not been given immunity and by instructing Gary not to testify that he kissed and fondled the victim in the car before the murder.
Such claims present mixed questions of law and fact. Rogers, 782 So.2d at 376-77. We therefore apply a mixed standard of review, "defer[ring] to the factual findings made by the trial court to the extent they are supported by competent, substantial evidence, but review[ing] de novo the application of those facts to the law." Lightbourne v. State, 841 So.2d 431, 437-38 (Fla.2003) (citing Stephens, 748 So.2d at 1031-32).
The circuit court found that the State did not offer Gary immunity in exchange for his testimony. At the evidentiary hearing, Gary testified that the police officer who escorted him into the courtroom told him that he had been given immunity. On cross-examination, however, he testified that at trial, in response to questioning from Sochor's counsel, he had stated that he never thought the police viewed him as a suspect. Kelly Hancock, the prosecutor at Sochor's trial, testified that he never offered Gary immunity and that police officers do not have the power to grant witnesses immunity.
The circuit court found Gary's evidentiary hearing testimony to be "unreliable and not credible." On the other hand, it found Hancock's testimony to be "candid, trustworthy, and credible." On appeal, Sochor simply argues that the circuit court's finding of fact was incorrect. He argues that the court should have believed Gary rather than Hancock. We defer to the circuit court's resolution of the issue because its finding that the State did not give Gary immunity in exchange for his testimony is supported by competent, substantial evidence. Cf. Kight v. Dugger, 574 So.2d 1066, 1073 (Fla.1990) ("There was sufficient competent evidence adduced at the rule 3.850 hearing to support the trial court's denial of this [Brady] claim. While there was conflicting testimony concerning whether the state made concessions in exchange for the informants' testimony, it was within the trial court's discretion to find the state's witnesses more credible than those of the defense.").
We also defer to the circuit court's factual finding that Hancock never instructed Gary to lie about his alleged sexual contact with the victim. This, too, was a *786 matter of Gary's testimony versus Hancock's testimony. Gary testified at the evidentiary hearing that Hancock told him not to mention in his testimony that he had kissed and fondled the victim. Hancock, on the other hand, testified that Gary never told him that he had kissed and fondled the victim. Furthermore, at trial, in response to a question from Hancock, Gary testified that no one had told him what to say, and that Hancock had told him to tell the truth. The only evidence suggesting that Hancock told Gary to lie was Gary's evidentiary hearing testimony, which was contradicted by Hancock's evidentiary hearing testimony and by Gary's own trial testimony. We cannot say that the circuit court's decision to discredit Gary's evidentiary hearing testimony was unreasonable or unsupported. See Armstrong v. State, 642 So.2d 730, 735 (Fla.1994) (stating that recanted testimony, especially when it involves a confession of perjury, is exceedingly unreliable). We therefore affirm the circuit court's denial of Sochor's Brady and Giglio claims.

C. Motion to Disqualify

The postconviction circuit court denied some of Sochor's motions (to compel production of public records and to clarify other orders of the court related to public records production) during a hearing at which Sochor's counsel was not present. Thereafter, Sochor filed a motion to disqualify the judge and now argues that the circuit court erred in denying the motion. In Arbelaez v. State, 775 So.2d 909 (Fla.2000), we defined the relevant test as follows:
A motion to disqualify will be dismissed as legally insufficient if it fails to establish a well-grounded fear on the part of the movant that he will not receive a fair hearing. To determine if a motion to disqualify is legally sufficient, this Court looks to see whether the facts alleged would place a reasonably prudent person in the fear of not receiving a fair and impartial trial.
Id. at 916 (citation omitted). We conclude that Sochor's motion to disqualify was legally insufficient and the circuit court did not err in refusing to grant the motion.
The record reveals that Sochor's lawyer's absence from the hearing in question was the result of a scheduling mistake. At that hearing, the circuit court, without hearing argument by the State, "presently denied" the motions for clarification and denied the motion to compel disclosure as "duplicative" of a motion previously denied. This was all done in open court and was transcribed. The court later held more public records hearings with both sides present.
We rejected a claim similar to Sochor's in Barwick v. State, 660 So.2d 685 (Fla.1995). Barwick filed a motion to disqualify, alleging that the judge had denied his motion to appoint a psychiatrist "after an ex parte communication with the prosecution." Id. at 692. Barwick claimed that in open court, but without defense counsel present, the prosecutor requested that the judge hold a hearing on the defense motion to appoint a psychiatrist. Instead, the court denied the defense motion. Id. We held that Barwick's allegation did "not support an inference that there was an ex parte communication ... as to anything other than a request by the assistant state attorney for another hearing on the motion." Id. We reaffirmed our prior statement "that a judge is not to have any substantive communication with counsel for any party," but held that Barwick's allegation was not sufficient to establish that "such an ex parte communication occurred. Nor did the allegation establish that any ex parte communication that might have occurred was a legally sufficient *787 basis for granting the motion for disqualification." Id.
We believe the same is true here. Like the hearing in Barwick, the transcript of the hearing here demonstrates that it was not "such an ex parte communication" that provides a legally sufficient basis for a motion to disqualify.

D. Claims Summarily Denied by Circuit Court

Sochor contests the circuit court's summary denial of five of his claims: (1) that the State violated Brady by withholding, or that trial counsel was ineffective for failing to discover and present, evidence that Sochor could have used to impeach witness Gary Sochor, specifically police interviews with Gary and reports of polygraph tests given to Gary by the police that were inconsistent with Gary's trial testimony; (2) that trial counsel was ineffective for failing adequately to investigate the circumstances surrounding Sochor's statements to police and for failing adequately to litigate the motion to suppress the statements; (3) that trial counsel was ineffective for failing to raise proper objections at trial and thereby preserve numerous meritorious issues for appeal;[25] (4) that trial counsel was ineffective for failing to present evidence of Sochor's mental health in support of his motion to suppress Sochor's statements to police; and (5) that the procedure by which trial courts in Broward County appoint special public defenders and expert witnesses creates conflicts of interest for the trial court judges that prevent them from being independent and neutral. We reject each of these claims.
We reject claim (1) because the record conclusively establishes that Sochor is not entitled to relief on this claim and, therefore, was not entitled to an evidentiary hearing on the matter. See Freeman v. State, 761 So.2d 1055, 1061 (Fla.2000). The transcript of defense counsel's cross-examination of Gary Sochor reveals that counsel was indeed aware of Gary's prior statements to police and used them in an attempt to impeach Gary's trial testimony. As for the polygraph tests, their results would not have been admissible at trial without the consent of both parties. See Walsh v. State, 418 So.2d 1000, 1002 (Fla.1982). We reject claims (2), (3) and (4) because the allegations are merely conclusory.[26]See Gaskin v. State, 737 So.2d 509, 513 n. 7 (Fla.1999) (finding ineffective-assistance claims to be insufficient to warrant relief because petitioner did "not allege[] how the outcome of his trial would have been different had counsel properly objected to the asserted error"); see also Lawrence v. State, 831 So.2d 121, 133 (Fla. *788 2002) ("A defendant may not simply file a motion for postconviction relief containing conclusory allegations that his or her trial counsel was ineffective and then expect to receive an evidentiary hearing.") (quoting Kennedy v. State, 547 So.2d 912, 913 (Fla. 1989)). And finally, we reject claim (5) because it is "meritless on its face." See Rivera v. State, 717 So.2d 477, 480 n. 2 (Fla.1998).

E. Counsel's Failure to Object to Jury Instructions

Sochor argues that his attorney was ineffective for failing to object to the following jury instructions: (1) the instructions regarding the "prior violent felony," "committed during the course of a felony," "cold, calculated, and premeditated," and "heinous, atrocious, or cruel" aggravating circumstances; (2) the instruction that he claims improperly shifted to him the burden of proving that a death sentence was inappropriate; (3) the instruction that he claims led the jury to believe that its role was merely "advisory," in violation of Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985); and (4) the instruction concerning the "murder in the course of a felony" aggravating circumstance, which he claims violated Stringer v. Black, 503 U.S. 222, 112 S.Ct. 1130, 117 L.Ed.2d 367 (1992), by rendering that aggravating circumstance "illusory."
We reject each of these claims because Sochor cannot demonstrate the prejudice required to prevail on an ineffective assistance of counsel claim. On direct appeal, we found that the "prior violent felony," "committed during the course of a felony," and "heinous, atrocious, or cruel" aggravating circumstances were supported by the evidence. Sochor, 619 So.2d at 292. And although we found on direct appeal that the "cold, calculated, and premeditated" aggravating circumstance was not supported by the evidence, we held the error to be harmless beyond a reasonable doubt. Id. at 292-93. We also held that the burden-shifting claim, while not preserved for review, was nevertheless without merit. Id. at 291 n. 10; see also Demps v. Dugger, 714 So.2d 365, 367-68 & n. 8 (Fla.1998) (holding such a claim to be procedurally barred as an issue that should have been raised on direct appeal and noting that such claims repeatedly have been rejected on the merits). We also stated on direct appeal that Florida's standard jury instructions do not violate Caldwell. See Sochor, 619 So.2d at 291. And finally, we previously have held that there is no merit to the argument that an underlying felony cannot be used as an aggravating circumstance. See Freeman v. State, 761 So.2d 1055, 1067 (Fla.2000).

F. Remaining 3.850 Claims

Sochor claims that he is entitled to relief for constitutional errors, even though otherwise procedurally barred, because he is "innocent of the death penalty." We reject the claim because we found on direct appeal that the evidence supported the existence of three aggravating circumstances. Sochor, 619 So.2d at 292; see also Allen v. State, 854 So.2d 1255, 1258 n. 5 (Fla.2003) (holding that innocence of death penalty claim lacks merit because defendant did not allege that all the aggravating circumstances supporting his death sentence were invalid, and because this Court had already conducted a proportionality review on direct appeal). We also reject Sochor's constitutional attack on the rules prohibiting lawyers from contacting jurors because the claim should have been raised on direct appeal and, therefore, is procedurally barred. See Thompson v. State, 759 So.2d 650, 667 n. 12 (Fla.2000). Sochor's claim that Florida's death penalty statute is unconstitutional is also procedurally barred. We rejected this claim on direct appeal. Sochor, 619 So.2d at 293. *789 And Sochor's claim that execution by electrocution or by lethal injection constitutes cruel and unusual punishment is without merit. See Provenzano v. Moore, 744 So.2d 413, 415 (Fla.1999) (holding that execution by electrocution is not cruel and unusual punishment); Sims v. State, 754 So.2d 657, 668 (Fla.2000) (holding that execution by lethal injection is not cruel and unusual punishment). Finally, our resolution of the preceding claims leads us to reject Sochor's "cumulative errors" argument. See Bryan v. State, 748 So.2d 1003, 1008 (Fla.1999) ("[W]here allegations of individual error are found without merit, a cumulative-error argument based thereon must also fail.").

III. HABEAS CORPUS

A. Ineffective Assistance of Appellate Counsel

Sochor argues that his appellate counsel was ineffective for failing to raise the "cumulative error" issue and for failing to ensure a complete appellate record. We reject the first claim because our opinion on direct appeal indicates that appellate counsel did raise the issue of cumulative error. See Sochor, 619 So.2d at 290 ("After carefully reviewing the record, we find that the claimed errors, taken individually or collectively, do not constitute fundamental error."). We reject the second claim because Sochor has not pointed to any errors that occurred during the untranscribed portions of the proceedings; he therefore has not established the necessary element of prejudice. See Thompson v. State, 759 So.2d 650, 660 (Fla.2000).[27]

B. Harmless Error Analysis on Direct Appeal

Sochor's claim that this Court did not conduct a proper harmless error analysis is without merit. On remand from the United States Supreme Court, we held that "beyond a reasonable doubt, eliminating the invalid [aggravating] factor would have made no difference in Sochor's sentence. The trial court's reliance on the unsupported aggravator, therefore, was harmless error." Sochor, 619 So.2d at 293. In any event, such a claim is procedurally barred. See Bottoson v. State, 813 So.2d 31, 35 (Fla.2002) ("This Court has consistently held that habeas claims wherein the defendant challenges this Court's previous standard of review in the case are procedurally barred."); Thompson v. State, 759 So.2d 650, 657 n. 6 (Fla.2000) (rejecting claim that this Court conducted an improper harmless error analysis during direct appeal and characterizing the claim as an improper "invitation to utilize the writ of habeas [corpus] as a vehicle for the reargument of issues which have been raised and ruled on by this Court.").

C. Constitutionality of "HAC" Aggravator

We reject Sochor's claim that the jury instruction on the "heinous, atrocious, or cruel" aggravating circumstance was unconstitutionally vague. We rejected the issue on direct appeal. Sochor, 619 So.2d at 291 & n. 10. Furthermore, we found that the evidence was sufficient to support this aggravating factor. Sochor, 619 So.2d at 292.

*790 D. Ring Claim

Sochor argues that Florida's capital sentencing statute is unconstitutional under Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). We previously have addressed this claim and denied relief. See Jones v. State, 845 So.2d 55, 74 (Fla.2003); Bottoson v. Moore, 833 So.2d 693 (Fla.), cert. denied, 537 U.S. 1070, 123 S.Ct. 662, 154 L.Ed.2d 564 (2002); King v. Moore, 831 So.2d 143 (Fla.), cert. denied, 537 U.S. 1067, 123 S.Ct. 657, 154 L.Ed.2d 556 (2002).
Furthermore, two of the aggravating circumstances found by the trial court were that Sochor had been convicted of a prior violent felony and that the killing was committed while Sochor was engaged in the commission of a felony. We have previously denied relief in similar cases. See, e.g., Doorbal v. State, 837 So.2d 940, 963 (Fla.) (rejecting Ring claim where one of the aggravating circumstances found by the trial judge was defendant's prior conviction for a violent felony), cert. denied, 539 U.S. 962, 123 S.Ct. 2647, 156 L.Ed.2d 663 (2003); Belcher v. State, 851 So.2d 678, 685 (Fla.) (rejecting Ring claim where two of the aggravating circumstances found by the trial judge were defendant's prior violent felony and that the murder was committed in the course of a felony), cert. denied, ___ U.S. ___, 124 S.Ct. 816, 157 L.Ed.2d 706 (2003).[28]

IV. CONCLUSION
For the reasons expressed above, we affirm the circuit court's denial of Sochor's rule 3.850 motion for postconviction relief and deny Sochor's petition for a writ of habeas corpus.
It is so ordered.
WELLS, QUINCE, CANTERO, and BELL, JJ., concur.
LEWIS, J., concurs in result only.
ANSTEAD, J., dissents with an opinion, in which PARIENTE, C.J., concurs.
ANSTEAD, J., dissenting.
While I agree with the majority that trial counsel's performance was patently deficient, I cannot agree that counsel's deficient performance did not prejudice the defendant's entitlement to have his plea for life presented to the jury by a competent lawyer. Among the factors that the majority overlooks is the fact that the death recommendation here, in spite of the incompetency of counsel, was not unanimous, and the fact that this Court itself later set aside the serious aggravator of CCP used to justify the sentence of death. In addition, the majority fails to acknowledge the quantitative as well as qualitative differences between the evidence presented by incompetent counsel at the penalty phase and the mitigation we now know existed but was not discovered or used. The majority has also mistakenly relied on the irrelevant guilt phase evidence of insanity and competency that was actually harmful to the defendant, to substitute for the mental health mitigation that was neither investigated nor presented at the penalty phase of Sochor's trial.[29]
*791 The majority's decision renders meaningless the Sixth Amendment guarantee of the right to counsel, and is tantamount to directing a judgment of death by concluding that having competent representation could not possibly have made a difference in the outcome. To the contrary, common sense and experience tell us that the presence of a competent lawyer is the thing that makes the most difference in capital cases.
Ironically, as the majority notes, the lawyer who represented Sochor was the same lawyer whose representation was found incompetent in Deaton v. Dugger, 635 So.2d 4 (Fla.1993). However, this Court unanimously ordered a new penalty phase in Deaton while the majority today has effectively deprived Sochor of his Eighth Amendment right to have a competent lawyer try to save his life. Consider our analysis in Deaton:
At the evidentiary hearing, the following colloquy took place between Deaton's postconviction counsel ["Q"] and Deaton's trial counsel ["A"]:
Q. In terms of preparing for trial in advance of conviction, what did you do to prepare for the penalty phase?
A. Very little. I usually don't try to prepare the penalty phase in advance of the verdict, so for some reason I just don't like to get psyched up and get a defeated attitude. I usually don't prepare until I lose [the conviction phase], then I started scrambling for something to do about the penalty phase.
....
Q. In terms of the penalty phase, did you explain to [Deaton] mitigating circumstances that you could pursue?
A. No, except he could testify as to his treatment and how he was emotionally abused as a child. Just very briefly, if he wanted to testify.
....
Q. Now in terms of documentation, records such as the hospital reports or divorce records or any of those H.R.S. files, did you talk to Jason about finding those records in order to try to introduce them at the penalty phase?
A. No.
Q. Were you aware that documents such as that may be admissible even if it's hearsay at the penalty phase?
A. Yes.
Q. Was there any reason why you didn't try and locate any of those documents prior to trial?
A. No, no reason.
....
Q. Now, do you recall how much time you had spent between the return of the guilty verdict and the start of the penalty phase?
A. Very little time.
Q. Was it like overnight?
A. I think overnight or the next day, couple of days. It was very little time.
Q. Do you recall what you tried to do in terms of developing the record or witnesses to testify?
A. Nothing at that point. There wasn't time to do it, except to wonder where his mother was. She indicated she would be back to ask Jason if he would like her to testify on his own behalf on the penalty phase.

*792 In view of this testimony and other substantial evidence presented at the postconviction hearing, including the testimony of two mental health experts, we believe that counsel's shortcomings were sufficiently serious to have deprived Deaton of a reliable penalty phase proceeding. Consequently, under the circumstances of this case, we must find that Deaton's counsel was ineffective and that such ineffective assistance was prejudicial.
Deaton v. Dugger, 635 So.2d at 8-9. Unlike the unanimous majority in Deaton, today's majority misreads Strickland to impose a burden on the defendant to prove that the result in his case would have been different, an almost impossible burden. The majority appears to have applied an erroneous new trial standard expressly rejected by the U.S. Supreme Court in its analysis. See Strickland, 466 U.S. at 693, 104 S.Ct. 2052 ("On the other hand, we believe that a defendant need not show that counsel's deficient conduct more likely than not altered the outcome in the case."). Under the correct standard, it is difficult, if not impossible, to conclude, as we did in Deaton, that our confidence in the outcome of this proceeding is not undermined by the incompetence of this counsel's representation.
As the U.S. Supreme Court made abundantly clear in Strickland, "the ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged. In every case the court should be concerned with whether, despite the strong presumption of reliability, the result of the particular proceeding is unreliable because of a breakdown in the adversarial process that our system counts on to produce just results." Strickland, 466 U.S. at 696, 104 S.Ct. 2052. Obviously, there is a breakdown in the adversarial process when one side goes virtually unrepresented while the other side has the awesome power of the state behind it. As a result we have inconsistently enforced one defendant's right to competent counsel while denying that right to another defendant represented by the same incompetent lawyer.
PARIENTE, C.J., concurs.

APPENDIX

ARGUMENT IN REPLY

ARGUMENT I
IT WAS ERROR FOR THE LOWER COURT TO DENY MR. SOCHOR A NEW PENALTY PHASE FOLLOWING THE EVIDENTIARY HEARING
The State asserts that the trial court correctly denied Mr. Sochor's claim that his trial counsel was ineffective at his penalty phase. In its argument the State echoes the lower court's finding that trial counsel's strategy was "reasonable," that the additional testimony presented at the evidentiary hearing was "cumulative" and that the mental health evidence presented was "almost identical" to that adduced at trial. This argument is at odds with the prevailing law and is not borne out by the record.
The Eleventh Circuit Court of Appeals has set forth the proper analysis for investigation omission in death penalty cases:
First it must be determined whether a reasonable investigation should have uncovered such mitigating evidence. If so, then a determination must be made whether the failure to put this evidence before the jury was a tactical choice by trial counsel. If so, such a choice must be given a strong presumption of correctness and the enquiry is generally at an end. If however the failure to present the mitigating evidence was an oversight and not a tactical decision, then a *793 harmlessness review must be made to determine if there is reasonable probability that, but for counsel's unprofessional errors the result of the proceeding would have been different.
Middleton v. Dugger, 849 F.2d 491, 493 (11th Cir.1988). Both the lower court's and the State's analysis fall well short of this standard.
The record of the Rule 3.850 evidentiary hearing established unequivocally that trial counsel did not start his penalty phase investigation until after the guilt phase was over. Both Charles and Rosemary Sochor testified that they were not contacted by trial counsel until the trial was under way (T. 135, T. 198) and that counsel neither enquired about Mr. Sochor's background nor spent any more than half an hour preparing them (T. 198). Kathy Cooper testified that she was not contacted by anyone until her mother called her the night that Mr. Sochor was found guilty (T. 210) and that she only testified at her own insistence and not on any request from trial counsel (T. 212). She spent "maybe two minutes" talking with trial counsel before taking the stand (T. 212). The record of the penalty phase shows that Kathy Cooper, Rosemary Sochor and Charles Sochor were not subjected to traditional direct examination about Mr. Sochor's life but rather asked to prepare statements that they would like the jury to hear. Trial counsel was actually delegating the responsibility of developing mitigation to the witnesses themselves. Essentially trial counsel abandoned his responsibility to Mr. Sochor to three lay witnesses who could not be expected to have a thorough understanding of Eighth Amendment jurisprudence and understand the nature of mitigation in a penalty phase of a capital trial. This was not "reasonable" and did not represent a "very thorough investigation." (Answer Brief at 11).
Moreover, the numerous other witnesses presented at Mr. Sochor's evidentiary hearing were not even contacted by trial counsel. Several other family members, school teachers and friends who would have been ably willing and ready to testify were never even telephoned by trial counsel. Had they been asked, they would have been willing to testify at Mr. Sochor's capital trial. This does not constitute the "very thorough investigation" claimed by the State, (Answer Brief at 11), nor does it pass constitutional muster.
Trial counsel was similarly incompetent in his investigation of Mr. Sochor's mental health mitigation. The State claims that the evidence presented by Mr. Sochor's post conviction counsel at his evidentiary hearing was "almost identical" to that adduced at trial from Dr. Zager, Dr Ceros-Livingston and the State's trial expert, Dr. Castillo. Answer Brief at 16. This is not borne out by the record. First of all, the purpose of Dr. Zager and Dr. Ceros-Livingston's evaluation was not to develop mental health mitigation, but simply to evaluate Mr. Sochor for competency and sanity, a fact which the State notably omits form its argument. The reports of Dr. Zager and Dr. Castillo indicate that they were merely asked to address competency and sanity and make no reference to the presence or absence of mitigating factors. See Defense exhibit 3, October 21, 1987. See also Dr. Ceros-Livingston's evidentiary hearing testimony, T. 553-554. The Eleventh Circuit has held that
Regarding mental health mitigating evidence our court has distinguished between its use during the guilt phase to establish competency to stand trial and presenting mental health mitigating evidence at the penalty phase:
"There is a great difference between presenting evidence to establish incompetency *794 at trail and failing to pursue mental health mitigating evidence at all. One can be competent to stand trial and yet suffer form mental health problems that the sentencing jury and judge should have had an opportunity to consider." Blanco v. Singletary, 943 F.2d [1477,] 1503 n. 147 (11th Cir.1991).
Where mental health mitigating evidence was available and absolutely none was presented [by counsel] to the sentencing body and no strategic reason was put forward for this failure "our court determined that this omission was objectively unreasonable." Id. citing Middleton v. Dugger, 849 F.2d 491, 493-95 (11th Cir.1988).
Hardwick v. Crosby, 320 F.3d 1127, 1163-64 (11th Cir.2003). The same considerations apply equally to Mr. Sochor's case. "The primary purpose of the penalty phase is to ensure that the sentence is individualized by focusing on the particularized characteristics of the defendant." Brownlee v. Haley, 396[306] F.3d 1043, 1074 (11th Cir. 2002), citing Cunningham v. Zant, 928 F.2d 1006, 1019 (11th Cir.1991). To address the particularized characteristics of a defendant in any meaningful way it is necessary to perform a much more in-depth evaluation than that required for the determination of competency and/or sanity. Competency and sanity are purely legal concepts. As such they are narrowly defined, and to determine their presence or absence, only a relatively few number of questions have to be answered. By contrast, mental health mitigation is a much more open ended concept. Since the Eighth and Fourteenth Amendments require that sentencer "not be precluded from considering as a mitigating factor any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence of less than death," Lockett v. Ohio, 486[438] U.S. 586, 604, [98 S.Ct. 2954, 57 L.Ed.2d 973 (1978)] it requires a much more thorough evaluation on the part of the mental health professional. Thus the development of mental health mitigation requires a much more thorough investigation in to the defendant's background, including obtaining collateral information in order to find out about those aspects of the defendant's life and the offense that would allow the sentencer to make a meaningful decision as to sentence. This was manifestly not done in Mr. Sochor's case.
Trial counsel's preparation and examination of Dr. Zager and Dr. Ceros-Livingston revealed a total lack of awareness of the nature of mitigation. As Dr. Ceros-Livingston testified on cross examination at the evidentiary hearing, no background materials had been supplied to the experts up front. No jail records, school records or military records were provided to the doctors. See T. 555-556. They had not been given any access to any family or friends of Mr. Sochor for any independent verification of his childhood experiences and substance abuse history. Id.[30] Nor indeed could they have been, since at that *795 time Mr. Rich had no idea of what the family members knew and could describe. Whether these evaluations were adequate for sanity and competency determinations is a separate and distinct issue from that of mitigation.
Dr. Zager and Dr. Ceros-Livingston were obliged to rely entirely on their own observations and testing of Mr. Sochor, based on Mr. Sochor's self-reporting. This inevitably diminished the value of the testimony of Dr. Zager and Dr. Ceros-Livingston. In particular, it opened the door to an accusation by the State that Mr. Sochor was self-serving, which in turn rendered their testimony less compelling. Had Dr. Zager and Dr. Ceros-Livingston had the benefit of such independent corroboration of Mr. Sochor's life history as well as proper instructions from counsel, the outcome would have been different.[31]
At the evidentiary hearing Dr. Froming established the absolute necessity of reviewing extensive background information about the subject, including documentary evidence and interviews with family members:
[by Dr. Froming] Okay, first of all in doing a neuropsychological evaluation you're looking for various areas of potential risk factors. And when you look at these various areas, you are attempting to determine whether or not there is a possibility of the existence of brain damage.
If there are no risk factors there, then I generally will not proceed with the evaluation. So I was very careful to kind of comb through all of this and see if, in fact, there was an evaluation really warranted.
(T. 435).
Thus, while Dr. Froming determined the need for neuropsychological testing from her review of background information, such a course was not open to Dr. Ceros-Livingston or Dr. Zager because they were not provided with these resources. Had such background information been made available, the multiple risk factors for potential brain damage were apparent. Dr. Froming noted risk factors including Mr. Sochor's mother's smoking during pregnancy; a complicated birth involving the use of forceps; numerous head injuries caused by physical abuse; Mr. Sochor's childhood head banging; his fall from a horse; a fall from the bleachers at school; his fall onto a toy tin horn resulting in the horn being rammed up into his soft palate; a motor cycle accident involving loss of consciousness; alcohol abuse; binge drinking; and severe family violence (T. 435-436). All of these factors indicate possible brain injury and dysfunction and should have been factored into the Doctors' evaluations. Because they were not, the evidence of Mr. Sochor's brain damage was not discovered or presented to the jury.[32]
*796 Additionally, trial counsel's failure to provide his experts with access to family members meant that the experts never heard the true nature and extent of the endemic family violence within the Sochor home. While it is true that Mr. Sochor did report some childhood physical abuse, the extent and gravity of his childhood trauma could only have been made available through interviews of family members. Had this been considered, evidence of Mr. Sochor's post traumatic stress disorder would have been uncovered and available to be presented to the jury.
Even despite the shortcomings of the findings of Dr. Zager and Dr. Ceros-Livingston in terms of developing mental health mitigation, the self-revelations made to these doctors by Mr. Sochor should have put trial counsel on notice that further mental health investigation was necessary. Dr. Zager found that Mr. Sochor had a history of substance and alcohol abuse, including a history of alcoholic blackouts. However trial counsel failed to investigate the logical corollary of this finding by having Mr. Sochor's brain functioning evaluated. Trial counsel should have been aware that excessive substance abuse can lead to brain injury and functional deficits. Had he done so through the use of a neuropsychologist he would have discovered extensive brain damage which would have supported statutory and non-statutory mental health mitigation. Dr. Froming testified that Mr. Sochor sufferers from brain damage caused in part by his excessive ingestion of LSD. The failure to follow up Mr. Sochor's reports to Dr. Zager about his alcohol and substance abuse thorough appropriate neuropsychological testing is not "reasonable" and does not constitute "a very thorough investigation".
Similarly, trial counsel was on notice that Mr. Sochor was being medicated with Lithium. He should have investigated the uses of Lithium and would thus have discovered that it is a psychiatric medication used in the treatment of manic depressive illness or bipolar disorder. Had he investigated further, he would have been able to ascertain that Mr. Sochor does indeed suffer from bipolar disorder. At the evidentiary hearing Dr. Greer testified that Mr. Sochor exhibited "tangentiality" and "flight of ideas" both typical of manic depressive illness (T. 391) and that he exhibited inappropriately euphoric behavior (T. 393). If trial counsel had followed up the avenue of Mr. Sochor's bipolar disorder, he would have been able to present Mr. Sochor as an individual with major psychiatric disorder which would better explain his actions and pride an individualized sentence which took account of Mr. Sochor's individual circumstances. These mental health issues form the basis of statutory and non statutory mitigating circumstances which should have been presented to the triers of fact who would have been obliged to consider them:
[T]he Eighth and Fourteenth Amendments require that the sentencer not be precluded from considering as a mitigating factor any aspect of a defendant's character or record and any of the circumstance of the offense that the defendant proffers as a basis for a sentence less than death.
Eddings v. Oklahoma, 465[455] U.S. 104, 110, [102 S.Ct. 869, 71 L.Ed.2d 1 (1982)] quoting Lockett v. Ohio, 486[438] U.S. 586, *797 604[, 98 S.Ct. 2954]. Mr. Sochor's brain damage, his bipolar disorder and his post traumatic stress disorder, together with the statutory mental health mitigating circumstances they support, should have been considered by the jury. Because of trial counsel's incompetence they were not.
By no stretch of the imagination can these significant disabilities be described as "in most respects identical" to the substance abuse disorder and antisocial personality suggested by the trial experts. The only way in which they are similar is that there is a diagnosis at all, as opposed to a conclusion that Mr. Sochor was in sound mental health. The diagnoses of manic depressive illness, brain damage, PTSD, and substance abuse disorder are not fungible. They are separate and distinct psychiatric and psychological conditions with different causes, manifestations and symptoms. The State's allegation that this mental health evidence was "in most respects identical" to that adduced at trial (Answer Brief at 13) is inaccurate to the point of frivolity.
The State similarly complains that the lay witnesses' testimony is cumulative and offers little to that adduced at trial. The record shows that this is not so. First of all, there were certain mitigating circumstances that were briefly touched on at trial but of which the true extent and severity was not disclosed. The graphic horror of the physical abuse that Mr. Sochor suffered growing up is a case in point. That Mr. Sochor was beaten frequently with a belt (T. 215) that was doubled up to fashion a very thick strap (T. 240), and that he was kicked repeatedly and punched with a fist (T. 216) was not graphically described to the jury. The fact that these beatings sometimes resulted in Mr. Sochor being rendered unconscious (T. 241) was not presented to the jury. This was relevant, not only as mitigation its own right, but also to show an etiology for the brain damage that should have been presented as a mental health mitigating circumstance.
The same argument applies to the neglect and poverty suffered by Mr. Sochor as a child. While this was alluded to by Rosemary Sochor in her prepared statement that was read to the jury, the true extent of the childhood neglect was not brought out at Mr. Sochor's penalty phase. The neglect by Rose Sochor is evident from her evidentiary hearing testimony that she refused to interfere when her husband beat Dennis and the other children because she loved Charles and was afraid that he would leave (T. 114, 218). Mrs. Sochor's neglect of her son was a nonstatutory mitigator that should have been presented to the jury. Livingston v. State, 565 So.2d 1288, 1292 (Fla.1988). Similarly, the true extent of Mr. Sochor's childhood poverty was not presented to the jury. Blaine Sochor testified at the evidentiary hearing that it was not uncommon for the children to have to hunt for food (T. 247). He also remembered suffering from boils on his legs which he attributed to malnutrition (T. 247). See Foster v. State, 654 So.2d 112, FN5 (Fla.1995) (trial court found as nonstatutory mitigation (among others) the defendant's poverty).
Several family members and others testified to positive character traits which were not presented at trial, a point which the State conveniently omits to mention. For example, Helen Foley testified as to Mr. Sochor's artistic ability (T.303). This was something which was not brought out at trial at all despite the State's argument.
The State completely mischaracterizes the testimony offered by Louis LaScala and Christine Thatcher as "limited" to Mr. Sochor having "basketball talent" and "acting talent" (Answer at 26, 27). To the contrary, these witnesses offered first-hand *798 testimony regarding Mr. Sochor's inabilities to function. Mr. LaScala testified that Mr. Sochor some basketball abilities limited to shooting, but that he was introverted, could not interact with other members of the team, and would "disappear" on the court (T. 280). Mrs. Thatcher testified that Mr. Sochor's performances were strange, and that people were uncomfortable and unable to accept how different Mr. Sochor was (T. 266).
The State similarly tries to dismiss the fact that "Lascala never meet [sic] Sochor's parents" (Answer 27). This fact is significant because Mr. LaScala testified that as a basketball coach in a small town, he knew "90 to 95 percent" of the players' parents, and that it was "very unusual" (T. 276) to not know Mr. Sochor's parents. This again is symptomatic of Mr. Sochor's dysfunctional upbringing.
The State fails to address the testimony of Father Melvin Fox that within one school year Mr. Sochor's personality changed, he was on a "downward spiral," he became unmotivated and depressed, and he no longer participated in student life (T. 293). Fr. Fox also testified that Mr. Sochor was a loner, a follower, and that he suspected an "abusive situation" (T. 294). None of this significant information was elicited at trial.
The same considerations apply to the presentation of Mr. Sochor's childhood trauma, another recognized mitigating circumstance. Mr. Sochor's early years were marked by numerous physical accidents which should have given trial counsel further clues as to the possibility of brain impairment. Admittedly, Charles Sochor had testified at the penalty phase as to Mr. Sochor's accident with the toy tin horn which punctured his soft palate. However, the effects of such an injury, or the numerous other instances of physical trauma, some of which resulted in loss of consciousness to Mr. Sochor, were not fully developed.
Furthermore, there was no mention at all at the penalty phase of the pervasive sexual and emotional abuse that permeated the Sochor household during Mr. Sochor's childhood and teenage years. The State complains that "the only additional information provided by the parents and the siblings involved events not directly related to or even known by Appellant." Answer Brief at 26. However, the State notably fails to mention the fact that this kind of childhood trauma can result from factors which are not specifically known to the patient but cause an atmosphere of mistrust and uncertainty in the home. As Dr. Froming testified, it is not necessary to be consciously aware of the traumas experienced by other family members to be traumatized in turn by them:
[by Dr. Froming] [F]amily members knew something had happened to Melanie. When I would ask them about it they knew that there was a severe change in her personality around the age of 11 or 12 and she became regressive and began withdrawing form the family. She had developed a significant hatred of Gary and to this day has difficulty even being in the same hotel with him.
So, I mean it's apparent in the family tensions that kids pick up that something is going wrong in the family.
(T. 457).
Similar considerations apply to the family histories related by Charles and Rosemary Sochor. Charles Sochor's own traumatic childhood in turn adversely reduced his ability to function in the role of a caring parent to his ten children. Because he never knew what a normal childhood was, he was never able to provide it for his children. This, together with the effects of *799 his own traumas on his actions, made for additional family tensions which affected Mr. Sochor, even though he was not aware of their specific cause. These facts are part of the picture that should have been painted at trial to ensure Mr. Sochor was afforded the requisite individualized sentencing, but which the jury never heard. The presentation of mitigation is not a mere list of factors that can be checked off on a list, and the State's insistence that this information is not relevant shows a concrete approach in conflict with Eighth Amendment jurisprudence.
The State's dismissal of the evidentiary hearing testimony as to Mr. Sochor's drug and alcohol habit is similarly misplaced. Again, while some superficial reference was made to these issues by Charles Sochor at the penalty phase, the graphic extent of Mr. Sochor's prior drug habit was not presented to the jury. As Bill Mitchell testified at the evidentiary hearing, "During the year 1971, we'll say, Dennis and I together conservatively tripped over 150 times" (T. 154). The penalty phase jury was not presented with anything like this specific graphic testimony. Once again, it is quantitatively and qualitatively superior to that presented by defense counsel at the penalty phase." State v. Lara, 581 So.2d 1288, 1290 (Fla.1991). Again the State's argument is misleading and not borne out by the record.
Moreover the State's assertions regarding Mr. Sochor's intoxication on the night of the crime are fatally inconsistent. First of all, the State alleges that, "Critical to [the] diagnosis that statutory mitigation existed is a requirement that Sochor was significantly intoxicated on the night of the murder." Answer Brief at 24. This is not actually the case. Dr. Greer's finding of statutory mental health mitigating circumstances was predicated on a combination of some alcohol consumption combined with Mr. Sochor's pre-existing bipolar disorder. Dr. Greer further testified that even a small amount of alcohol would have had an effect given Mr. Sochor's condition and his previous abstinence for over a year (T. 399). Mr. Sochor's appearance some hours before or after the murder are simply not germane to his state at the time of the crime.
Furthermore, the State's position is internally inconsistent. In arguing that the mental health mitigation adduced at the evidentiary hearing was "virtually identical" to that presented during the guilt phase of Mr. Sochor's capital trial, the State argues that Dr. Zager was of the opinion that Mr. Sochor suffered from an alcoholic blackout at the time of the crime. Yet now it says that there is no evidence that Mr. Sochor was intoxicated at all. The State cannot have it both ways. On the one hand the State seeks to bolster Dr. Zager's testimony by stating that the evidence adduced at the evidentiary hearing was "virtually identical" to that at the trial, and then it disputes any intoxication at all, notwithstanding its complete failure to rebut Dr. Greer's testimony regarding the interaction of alcohol with manic depressive illness.
Additionally the State completely ignores the testimony of Gary Sochor regarding his conduct on the evening of the crime. At the evidentiary hearing Gary Sochor testified that Dennis Sochor had become agitated because he (Gary Sochor) had begun kissing the victim in the car (T. 347). It is the combination of Gary Sochor's admitted provocative behavior with Mr. Dennis Sochor's consumption of alcohol after a long abstinence, and his preexisting brain damage and bipolar disorder, which establishes the existence of the statutory mental health mitigation. The State's argument is misplaced.
*800 Both the State and the lower court apparently failed to understand the interplay and connections between the expert testimony and lay witness testimony. The State ignores that fact that even that evidence that was presented at the penalty phase was done in a piecemeal and haphazard fashion without regard for the integrated picture of Mr. Sochor that would have permitted a truly individualized sentencing. This is evidenced by trial counsel's delegation of his duty to present mitigating evidence to his witnesses and instructing them to read a statement to the jury rather than any independent planning or strategy. Without expert testimony to explain the significance of many of the events relayed by the witnesses, the true impact on Mr. Sochor was lost and the jury was not able to consider the individualized sentencing that Mr. Sochor was entitled to.
The record of the evidentiary hearing shows clearly that it was only after Mr. Sochor's conviction for first degree murder that trial counsel began to give any thought to the penalty phase. As this court has recently emphasized, "a defendant's penalty phase attorney clearly must have adequate time to prepare for the proceeding to protest the Defendant constitutional rights." State v. Lewis, 838 So.2d 1102, (Fla.2002). In doing so, this Court affirmed the standard set forth in Deaton v. Dugger, 635 So.2d 4 (Fla.1993). As this Curt noted in Lewis, "In Deaton the record revealed that defense counsel did not prepare for the penalty phase until after the guilty verdict was returned and then spent only a minimal amount of time in preparation ... and did not search for any records to establish mitigating circumstances." State v. Lewis, 838 So.2d 1102 (Fla.2002). Just as in Lewis and Deaton, this constituted deficient performance in Mr. Sochor's case.
Trial counsel's omissions can not be put down to strategy. As noted in Mr. Sochor's initial brief, Mr. Sochor's trial counsel, Charles Rich, was also Mr. Deaton's trial counsel. The State asserts that Mr. Sochor is attempting to rely on Mr. Rich's testimony in Deaton as evidence of what he did in Mr. Sochor's case. This is not the case. The unrebutted testimony of Charles Sochor, Rosemary Sochor and Kathy cooper, as well as that of the other witnesses who never testified at Mr. Sochor's capital penalty phase, shows that Mr. Rich unreasonably failed to instigate penalty phase investigation before the trial began. Since Mr. Rich was not available to testify at Mr. Sochor's evidentiary hearing, nobody knows whether he would have ascribed his omissions to strategy, as in Deaton, or to oversight. Mr. Sochor's argument is thus that even if Mr. Rich had been available to testify at Mr. Sochor's hearing, and even if he had testified the same way as in Deaton that his last minute preparation was "strategy," just as in Deaton, this would not have cured a finding of deficient performance. As the Eleventh Circuit has made plain, a "tactical or strategic decision is unreasonable if it is based on a failure to understand the law." Horton v. Zant, 941 F.2d [1449,] 1462 (11th Cir.1991). Thus, even in the absence of testimony from Mr. Rich, it is of no consequence whether his performance was based on purported strategy as in Deaton or not.
The State does not address the issue of prejudice as it appears to be confident that no deficient performance occurred. The appropriate analysis of the prejudice prong of Strickland requires an evaluation of the totality of the available mitigation evidence  both that adduced at trial and the evidence adduced in the [evidentiary hearing] *801 in reweighing it against the evidence in aggravation. Bottoson v. Moore, 234 F.3d 526, 534 (11th Cir.2002) (quoting Williams [v. Taylor], 529 U.S. [362,] at 397-98[, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000)]). It is clear from the record that "a reasonable probability that the result of the sentencing proceeding would have been different if competent counsel had presented and explained the significance of all the available evidence." Hardwick, 320 F.3d at 1191 (quoting Williams, 529 U.S. at 399[, 120 S.Ct. 1495]). Relief is warranted.
NOTES
[1] We have jurisdiction. See art. V, § 3(b)(1), (9), Fla. Const.
[2] For a description of the underlying facts, see Sochor v. State, 580 So.2d 595, 598-99 (Fla.1991), vacated, 504 U.S. 527, 112 S.Ct. 2114, 119 L.Ed.2d 326 (1992).
[3] The trial judge found the following aggravating circumstances: (1) Sochor had previously been convicted of a felony involving the use or threat of violence to the person; (2) the murder was committed while Sochor was engaged in the commission of a felony; (3) the murder was especially heinous, atrocious, or cruel; and (4) the murder was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification. Id. at 599 n. 2.
[4] Sochor claimed that: (1) the State withheld certain public records in violation of chapter 119, Florida Statutes; (2) the rules prohibiting Sochor's lawyers from interviewing jurors are unconstitutional and deny him adequate assistance of counsel in his postconviction proceedings; (3) the State failed to reveal, or trial counsel unreasonably failed to discover, that the State had made promises of lenient treatment to jailhouse informants or that jailhouse informants were operating as agents of the State; (4) trial counsel was ineffective, and the State violated Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), at the guilt phase; (5) the State violated Brady and Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), at the guilt phase; (6) the State made improper arguments at trial; (7) newly discovered evidence shows that Sochor's conviction and sentence are constitutionally unreliable; (8) Sochor is innocent of first-degree murder and innocent of the death penalty; (9) trial counsel was ineffective pretrial, during voir dire, and during the guilt phase; (10) Sochor was not competent to stand trial, and his counsel was ineffective for failing to secure an adequate mental health evaluation; (11) Sochor's mental health evaluations were constitutionally inadequate; (12) Sochor did not make a knowing and intelligent waiver of his constitutional rights, and his statements to police were admitted into evidence unconstitutionally; (13) Sochor did not make a knowing and intelligent waiver of extradition, and counsel was ineffective for failing to argue this point; (14) Sochor was not given notice that he would have to defend against a felony-murder charge; (15) the jury received improper instructions at the guilt phase, and trial and appellate counsel were ineffective to the extent they failed to preserve or raise this issue at trial and on appeal; (16) the procedure by which special public defenders and expert witnesses are appointed and funded creates an irreconcilable conflict of interest; (17) trial counsel was ineffective at the penalty phase; (18) the prosecutor and the judge unconstitutionally diluted the jury's sense of its role in sentencing; (19) the "cold, calculated, and premeditated" aggravating circumstance is unconstitutionally vague; (20) the "heinous, atrocious, or cruel" jury instruction was unconstitutionally vague; (21) the Florida Supreme Court did not conduct a proper harmless error analysis on remand from the United States Supreme Court; (22) the jury was improperly instructed on, and the judge improperly found, the "prior violent felony" aggravating circumstance; (23) Sochor's sentence rests upon an unconstitutionally automatic and illusory aggravating circumstance; (24) the jury and judge both unconstitutionally considered nonstatutory aggravating circumstances; (25) the judge unconstitutionally refused to find and weigh the mitigating circumstances set out in the record; (26) the State did not give notice of the aggravating circumstances it would allege; (27) the penalty phase jury instructions unconstitutionally shifted the burden to Sochor to prove that death was not the appropriate sentence; (28) Florida's death penalty statute is unconstitutional; (29) the cumulative effect of the errors at trial were not harmless and deprived Sochor of a fair trial; and (30) the State violated Brady by not revealing the results of polygraph tests administered to Gary Sochor, and counsel was ineffective for failing to discover and present this information.
[5] Huff v. State, 622 So.2d 982 (Fla.1993).
[6] The circuit court granted an evidentiary hearing on the following claims, summarily denying the remainder: the Brady and Giglio issues raised in claims (3), (4), and (5) regarding the testimony of the jailhouse informant and Gary Sochor; and the issues raised in claims (10), (11), and (17) regarding Sochor's competency to stand trial, the adequacy of the mental health evaluations, and the effectiveness of counsel's assistance at the penalty phase.
[7] On appeal of the circuit court's denial of his rule 3.850 motion, Sochor raises ten claims. He claims that: (1) he received ineffective assistance of counsel at the penalty phase of his trial; (2) the State committed a Brady violation by not revealing that it had given Gary Sochor immunity in exchange for his testimony; (3) he received a constitutionally inadequate mental health evaluation; (4) the postconviction circuit court judge should have granted Sochor's motion to disqualify himself; (5) several of his claims were improperly denied by the circuit court without an evidentiary hearing; (6) his trial counsel's failure to object to certain jury instructions was ineffective assistance; (7) he is innocent of the death penalty; (8) the rules that prohibit lawyers from contacting jurors are unconstitutional; (9) the death penalty statute is unconstitutional; and (10) the cumulative effect of the errors at trial deprived him of a fair trial.
[8] Sochor raises five claims in his habeas petition: (1) that he received ineffective assistance of counsel on direct appeal; (2) that this Court did not conduct a proper harmless error analysis on remand from the United States Supreme Court; (3) that the instruction for the "heinous, atrocious, or cruel" aggravating circumstance was unconstitutionally vague; (4) that he did not receive a proper appeal because the appellate record was incomplete; and (5) that Florida's capital sentencing statute is unconstitutional under Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002).
[9] Sochor's trial counsel was not alive to testify at Sochor's evidentiary hearing. Our review of the trial record and the evidentiary-hearing testimony reveals that Sochor's counsel probably employed the same "strategy" in preparing for Sochor's penalty phase as he did in preparing for the penalty phase in a different trial conducted before Sochor's trial. At the postconviction evidentiary hearing in that other case, conducted after Sochor's trial but before Sochor's evidentiary hearing, Sochor's counsel testified about his general approach to penalty-phase preparation. See Deaton v. Dugger, 635 So.2d 4, 8-9 (Fla.1993). It appears that he employed the same "strategy" in both cases.
[10] The United States Supreme Court's recent decision in Bell v. Cone, 535 U.S. 685, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002), makes clear that Sochor's claim is properly analyzed under the two-pronged test of Strickland  not under the presumed-prejudice standard of United States v. Cronic, 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984). Cronic held that "[t]here are ... circumstances that are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified." Id. at 658, 104 S.Ct. 2039. One of those circumstances is when "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing." Id. at 659, 104 S.Ct. 2039. However, in Bell, the Court stressed that "the attorney's failure must be complete." 535 U.S. at 697, 122 S.Ct. 1843. The Court rejected the defendant's claim that prejudice should be presumed because counsel failed to introduce mitigating evidence and did not make a closing argument at the penalty phase, holding that "[t]he aspects of counsel's performance challenged by [the defendant] ... are plainly of the same ilk as other specific attorney errors we have held subject to Strickland's performance and prejudice components." Id. at 697-98, 122 S.Ct. 1843. The Court distinguished claims that "counsel failed to oppose the prosecution throughout the sentencing proceeding as a whole" from claims that "counsel failed to do so at specific points," holding that "[f]or purposes of distinguishing between the rule of Strickland and that of Cronic, this difference is not of degree but of kind." Id. at 697, 122 S.Ct. 1843.
[11] The dissent mischaracterizes the prejudice inquiry as whether counsel's deficiencies "prejudice[d] the defendant's entitlement to have his plea for life presented to the jury by a competent lawyer." Dissenting opinion at 790. This formulation reads the required showing of prejudice out of the Strickland test completely: if a defendant established that his counsel's performance was deficient, that defendant would establish ipso facto that his right to have his case "presented to the jury by a competent lawyer" was prejudiced. The dissent also states that we have "render[ed] meaningless the Sixth Amendment guarantee of the right to counsel" and have essentially "direct[ed] a judgment of death by concluding that having competent representation could not possibly have made a difference." Dissenting op. at 790-91 (emphasis added). But this too misstates the law. As the United States Supreme Court held in Strickland, to be entitled to relief on a claim of ineffective assistance of counsel, "[i]t is not enough for the defendant to show that [counsel's] errors had some conceivable effect on the outcome of the proceeding." Strickland, 466 U.S. at 693, 104 S.Ct. 2052 (emphasis added). Rather, "the appropriate test for prejudice" requires the defendant to "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694, 104 S.Ct. 2052. In other words, in addition to showing that counsel's performance was deficient, Sochor must also show a reasonable probability that, but for counsel's deficiencies, he would have received a sentence of life imprisonment rather than death. Strickland defined a "reasonable probability" as "a probability sufficient to undermine confidence in the outcome." Id.

We also note that whether or not the State's brief argued the prejudice issue, see dissenting op. at 790 n. 28, is irrelevant. At all times throughout the postconviction process, the burden fell on Sochor to "affirmatively prove prejudice." Strickland, 466 U.S. at 693, 104 S.Ct. 2052. Even if the State focused primarily (or even exclusively) on the deficiency issue, that does not mean that the State either conceded or waived the prejudice issue, particularly in light of the fact that the trial court held that Sochor failed to establish prejudice. As we explain below, after reviewing the record and the evidentiary-hearing testimony, we have concluded that the trial court's factual findings relative to the prejudice issue are supported by competent, substantial evidence and, therefore, are entitled to our deference.
[12] The circuit court's order certainly was not a model of clarity, but we will make this point clearer below by recounting the relevant trial testimony and the relevant evidentiary-hearing testimony, and referencing the circuit court's relevant findings related thereto. See, e.g., infra at 780-81 (quoting State v. Sochor, No. 86-15270CF10A order at 9-12 (Fla. 17th Cir. Ct. order filed Mar. 28, 2001)) ("Postconviction order") ("Dr. Ceros-Livingston [one of Sochor's trial experts] testified at the evidentiary hearing that considering her previous evaluation in conjunction with the records and background material provided to her by the Defendant's appellate counsel in 1999, her diagnosis of the Defendant and testimony at the time of trial would have been the same. Dr. Ceros-Livingston testified at the evidentiary hearing that when the Defendant was evaluated in 1987, he did not have manic depressive disorder. Moreover, based upon the additional information provided to her in 1999, Dr. Ceros-Livingston did not think that the Defendant had bipolar disorder or organic brain damage at the time of the murder.... Dr. Ceros-Livingston clearly stated that her opinion would remain the same after considering the additional records.").
[13] Drs. Zager and Ceros-Livingston testified for the defense; Dr. Castillo testified for the State.
[14] Dr. Greer also believed that alcohol consumption on the night of the murder would have had an especially intense effect because Sochor had abstained from alcohol for a period of time prior to the night of the murder.
[15] Dr. Greer did not believe Sochor had antisocial personality disorder because his history did not indicate the trait of calculated monetary gain. He believed his history was more consistent with manic depressive illness than with antisocial personality disorder.
[16] Two of Sochor's sisters testified at the evidentiary hearing that they had been sexually abused, but there is no evidence in the record that Sochor himself had been the victim of sexual abuse, or that Sochor knew that his sisters had been abused.
[17] Dr. Froming also noted that "blackouts can occur at less alcohol [consumption] than that in someone who has been in partial remission" from substance abuse.
[18] The dissent argues that we have "fail[ed] to acknowledge the quantitative as well as qualitative differences between the evidence presented by incompetent counsel at the penalty phase and the mitigation we now know existed but was not discovered or used." Dissenting op. at 789-90. This argument, however, begs the question. As we stated in the text, the question we must answer in determining whether counsel's failure to investigate and present mental-health mitigation (a failure which we already held to constitute deficient performance) was prejudicial to Sochor's defense is whether significant additional mental-health-related mitigation evidence was available that could have been presented had counsel not been deficient in his investigation. Whether such evidence in fact was available was a point which was disputed at the evidentiary hearing  Sochor's two new experts testified that such evidence did exist; the State's expert (who was one of Sochor's trial experts) testified that such evidence did not exist. The postconviction trial judge gave greater weight to the testimony of the State's expert and found that such evidence in fact did not exist. So contrary to the dissent's contention, we have not "fail[ed] to acknowledge" the differences between the evidence presented at the penalty phase and the evidence that Sochor now claims could have been presented. Rather, we have deferred to a factual finding of the postconviction trial court  a finding that is supported by competent, substantial evidence  and conducted our independent analysis of the trial court's legal conclusion (i.e., whether Sochor has established prejudice) accordingly. See Porter, 788 So.2d at 923.
[19] Porter's expert testified that Porter "suffered from a mental condition that substantially impaired his ability to comply with the law." The State's expert disagreed and testified that "this mitigation was not present." 788 So.2d at 922-23. We noted that the circuit court "reject[ed] [Porter's expert's] testimony, and rather accept[ed] the testimony of [the State's expert] (who specifically disagreed with [Porter's expert]), on this issue." Id. at 923.
[20] We also noted in our opinion in Cherry that Dr. Barnard's original evaluation was limited to competency and sanity issues and that counsel did not request an evaluation for purposes of providing mitigating evidence during the penalty phase. Id. at 1052. We held, however, that even if counsel's performance was deficient, Cherry had not been prejudiced:

Dr. Barnard's report indicates that he was aware of Cherry's background and possible alcohol and drug use. Further ... [a]fter reviewing the materials [provided by postconviction counsel], Dr. Barnard concluded that no statutory mitigators existed....
Id.
[21] The dissent also refers to our decision in Deaton, see dissenting op. at 790-91, where we affirmed the postconviction trial court's order granting Deaton (who had been represented by the same counsel as Sochor) a new penalty phase. See Deaton, 635 So.2d at 8-9; see also majority op. at 772 n. 9. The dissent argues that our decision today is inconsistent with our decision in Deaton. The dissent seems to suggest that we did not require Deaton to demonstrate that he was prejudiced by counsel's deficient performance, and by requiring Sochor to make such a showing we are "inconsistently enforc[ing] one defendant's right to competent counsel while denying that right to another defendant represented by the same incompetent lawyer." Dissenting op. at 791; see also majority op. at 773 n. 11 (discussing the dissent's mischaracterization of the prejudice inquiry). The dissent, however, misreads Deaton. We recognized in Deaton that "prejudice is established by a finding that, but for the ineffective assistance of counsel, a reasonable probability exists that the outcome of the proceeding would have been different, or that, as a result of the ineffective assistance the proceeding was rendered fundamentally unfair." 635 So.2d at 8. In holding that Deaton had established that he was prejudiced by counsel's failure to investigate mitigation evidence, we noted that "no evidence whatsoever was presented to the jury ... even though evidence presented at the rule 3. 850 evidentiary hearing established that a number of mitigating circumstances existed." Id. (emphasis added). The critical distinction between the case before us and Deaton is that, contrary to the facts before us here, it appears that the evidentiary-hearing testimony presented by Deaton to establish the existence of mitigation evidence which could have been presented but for counsel's deficient performance was not controverted. Here, by contrast, the evidentiary-hearing testimony presented by Sochor was controverted by testimony presented by the State, and in resolving the conflict in testimony, the trial court gave greater weight to the testimony presented by the State. Cf. Cherry v. State, 781 So.2d 1040, 1051 (Fla.2000).

It is not inconsistent, therefore, in applying the two-pronged test for ineffective assistance of counsel articulated in Strickland to grant relief to one defendant and deny relief to another defendant whose counsel was similarly deficient  each defendant must prove independently that had counsel not been deficient, there is a reasonable probability (a probability sufficient to undermine confidence in the outcome) that he would not have been sentenced to death. Similar deficiencies will affect different proceedings differently. "[T]he ultimate focus of inquiry must be on fundamental fairness of the proceeding whose result is being challenged." Strickland, 466 U.S. at 696[, 104 S.Ct. 2052] (emphasis added); see also id. ("In every case the court should be concerned with whether ... the result of the particular proceeding is unreliable because of a breakdown in the adversarial process....") (emphasis added). The fact that Deaton's penalty-phase proceeding was rendered fundamentally unfair by counsel's deficient performance does not answer the relevant question before us: whether Sochor's penalty-phase proceeding was rendered fundamentally unfair.
[22] We also reject Sochor's claim that he received a constitutionally inadequate mental health evaluation in violation of Ake v. Oklahoma, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), as a result of his counsel's ineffective assistance. To the extent this claim is identical to his claim of ineffective assistance of counsel at the penalty phase, we reject it for the same reasons discussed above. To the extent Sochor claims that he was incompetent to stand trial, we note that none of his evidentiary hearing experts testified that he was incompetent.
[23] Brady requires the State to disclose material information within its possession or control that tends to negate the guilt of the defendant. To establish a Brady violation, the defendant must show the following: (1) that the evidence at issue is favorable to him, either because it is exculpatory or because it is impeaching; (2) that the evidence was suppressed by the State, either willfully or inadvertently; and (3) that the suppression resulted in prejudice. Rogers v. State, 782 So.2d 373, 378 (Fla.2001) (citing Strickler v. Greene, 527 U.S. 263, 280-82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999)).
[24] A Giglio violation is established when a petitioner shows that: (1) a witness gave false testimony; (2) the prosecutor knew the testimony was false; and (3) the statement was material. Guzman v. State, 868 So.2d 498, 505 (Fla.2003) (citing Ventura v. State, 794 So.2d 553, 562 (Fla.2001)).
[25] Sochor cites the following as errors to which trial counsel failed to object: (1) prosecutorial comments on facts not in evidence; (2) State witnesses' opinions regarding Sochor's truthfulness and guilt; (3) a defense witness' statement on cross-examination that someone in the prosecutor's office said Sochor was another Ted Bundy; (4) the State's arguments that this trial was the only time the State could try Sochor for his crimes; (5) the State's presentation of evidence regarding Sochor's bad character; (6) perjured testimony by a jailhouse informant regarding his deals with the State; (7) the court's failure to properly instruct the jury on noncapital lesser-included offenses, manslaughter, third-degree murder, and kidnapping; (8) the court's failure to instruct the jury on voluntary intoxication as a defense to felony murder based on kidnapping; (9) the court's failure to instruct the jury on the statute of limitations as an absolute defense to felony murder and kidnapping; and (10) the court's failure to give the long-form excusable homicide instructions.
[26] Claim (4) is also conclusively refuted by the record. Three mental health experts testified at trial that Sochor was competent and sane.
[27] We also reject Sochor's related claim that he did not receive a proper appeal because of omissions in the appellate record. The claim is procedurally barred. See Thompson, 759 So.2d at 660 (holding that because of petitioner's failure to raise the issue of the record's inadequacy on direct appeal, his postconviction claim on this basis was procedurally barred).
[28] We also reject Sochor's claim that the jury instructions unconstitutionally shifted to him the burden of proving that the mitigating circumstances outweighed the aggravating circumstances. We rejected this issue on direct appeal because it had not been properly preserved for review. Sochor, 619 So.2d at 291. We further held that the claim was without merit. Id. at 291 n. 10; see also Demps v. State, 714 So.2d 365, 368 n. 8 (Fla.1998) (holding claim to be procedurally barred as an issue that should have been raised on direct appeal and noting that such claims have repeatedly been rejected on the merits).
[29] Because appellant's reply brief more than adequately refutes the majority's analysis, I attach those relevant portions of the reply brief to this opinion. I especially note the closing comment in the reply brief that the State has made no argument on the prejudice issue, but rather has based its entire argument on its position that defense counsel's performance was not ineffective, a position this Court has unanimously rejected.
[30] The State complains that much of the material supplied to Mr. Sochor's experts prior to the evidentiary hearing were prison records generated after Mr. Sochor's death sentence was imposed. Admittedly, the background materials provided to Dr. Froming and Dr. Greer contained prison records generated after Mr. Sochor's capital trial and sentence of death, in addition to the aforementioned records dating from before his trial. However, to the extant that any of the experts relied on these records, they served merely to supplement the information contained within the documents generated prior to Mr. Sochor's trial. For example, Dr. Greer testified that prison medical records indicated that Mr. Sochor was being treated with Lithium for manic depressive illness, and that this was consistent with the jail records and Dr. Greer's own clinical diagnosis.
[31] This is particularly true given Dr. Ceros-Livingston's conclusion that Mr. Sochor exhibited a tendency to malinger. Had she had access to family members to verify Mr. Sochor's history of poverty, abuse, neglect, physical abuse and emotional trauma, as well as substance abuse, her findings would have been different. While admittedly Dr. Ceros-Livingston did not think that her conclusions would have been different had she had access to the documents provided to Dr. Froming and Dr Greer, she never was afforded the chance to speak to any family members. She was not in a position to know or say what her conclusion would have been had she been afforded that opportunity. The State's reliance on her evidentiary hearing testimony as rebuttal is therefore misplaced.
[32] The State contends that Dr. Froming's testimony should not be considered in determining Mr. Sochor's claims because she was not personally available in 1989 for the penalty phase. The State's assertion is absurd. The issue is not whether Dr. Froming was personably available, but whether competent neuropsychological testing should have been afforded Mr. Sochor at the time of his trial. The State does not contend that the type of evaluation performed by Dr. Froming was not available in 1989.